756 F.2d 364
 22 ERC 1577, 1985 A.M.C. 2763, 53 USLW 2500,
15 Envtl. L. Rep. 20,411
 UNITED STATES of America, Plaintiff-Appellant,
v.
P/B STCO 213, ON 527 979, In Rem, Sabine Towing and
Transportation Co. and Water Quality Insurance
Syndicate, In Personam, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
T/B 7026, O. N. 010777, In Rem, Gulf Water Towing, Inc., In
Personam and Conoco, Inc., Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellee,
v.
T/B STCO 225, M/V ACHILLES, In Rem, Defendants,
Sabine Towing & Transportation Co., Inc., and Water Quality
Insurance Syndicate, Defendants-Appellants.
 Nos. 83-2644, 83-4716 and 84-2087.
 United States Court of Appeals,
Fifth Circuit.
 April 1, 1985.
 
 Daniel K. Hedges, U.S. Atty., James R. Gough, Jack Shepherd, Asst. U.S. Attys., Houston, Tex., for U.S. in No. 83-2644.
 Steven J. Delaney, Dept. of Justice Civ. Div., Torts Branch, Washington, D.C., for U.S. in all cases.
 Ross, Griggs & Harrison, Kent E. Westmoreland, J. Douglas Sutter, Houston, Tex., Thacher, Proffitt & Wood, John M. Woods, Sheldon A. Vogel, New York City, for defendants-appellees in Nos. 83-2644 and 84-2087.
 
 
 1
 Jones, Tete, Nolen, Hanchey, Swift & Spears, Gregory P. Massey, Lake Charles, La., for Conoco, Inc.
 
 
 2
 Appeal from the United States District Court for the Southern District of Texas.
 
 
 3
 Appeal from the United States District Court for the Western District of Louisiana.
 
 
 4
 Appeal from the United States District Court for the Eastern District of Texas.
 
 
 5
 Before REAVLEY, TATE, and HILL, Circuit Judges.
 
 TATE, Circuit Judge:
 
 6
 These three consolidated appeals require us to decide what, if any, limitations period governs actions brought by the United States under the Federal Water Pollution Control Act (FWPCA) to recover the cost of cleaning waters polluted by the discharge of oil or hazardous substances. See 33 U.S.C. Sec. 1321(f)(1) (establishing the cause of action).
 
 
 7
 All three appeals involve the cleanup of oil discharged from barges into navigable waters. The defendants--the alleged polluters--did not clean up the discharges. Accordingly, the United States hired private contractors to do the cleanup work. More than three but less than six years after the completion of the cleanup operations, the United States instituted civil actions to recover its cleanup costs.
 
 
 8
 The FWPCA specifies no limitations period applicable to such civil actions. Congress has, however, enacted a general statute of limitations, 28 U.S.C. Sec. 2415, which bars actions by the United States after six years if "founded upon any contract express or implied in law or fact," 28 U.S.C. Sec. 2415(a), and after three years if "founded upon a tort," 28 U.S.C. Sec. 2415(b).
 
 
 9
 The United States contends that neither the tort nor the contract provision of Sec. 2415 applies, reasoning that an FWPCA action to recover pollution cleanup costs is a unique statutory action not founded upon tort or contract. Alternatively, the United States contends that an FWPCA action is founded upon a contract implied in law (a quasi-contract arising from the performance by the United States of a cleanup duty belonging primarily to the defendants) and therefore within the six-year contract provision of Sec. 2415(a). The defendants, on the other hand, assert that Sec. 2415(b)'s three-year tort provision applies to FWPCA pollution cleanup actions because such actions are founded upon the tort of oil pollution.
 
 
 10
 We hold that the six-year contract limitations period in the general statute of limitations, 28 U.S.C. Sec. 2415(a), governs FWPCA actions brought by the United States to recover pollution cleanup costs. Pollution may, as the defendants urge, be a tort. The nub of an FWPCA cleanup cost recovery action, however, is the cleanup of the pollution--not the act of polluting. The FWPCA imposes a primary duty on the polluter to clean up. Upon the polluter's non-performance of that duty, the FWPCA authorizes the United States to clean up and thereafter to recover its costs. Thus, the United States does not assert a right to compensatory damages based on the polluter's breach of the duty not to pollute. Rather, the United States asserts a right to restitution based on the costs it incurred in performing the polluter's duty to clean up. This, we believe, constitutes an action founded upon a contract implied in law (quasi-contract).
 
 I.
 
 11
 No. 83-2644--Almost Five Years After Cleanup
 
 
 12
 Petroleum barge STCO 213 collided with another vessel and its tow near Galveston, Texas on October 31, 1977. 42,000 gallons of number six oil spilled from a hull fracture in P/B STCO 213 into Galveston Bay. The United States hired private contractors to clean up the spill. The cleanup was completed approximately November 9, 1977 at a cost to the United States of $197,758.41.
 
 
 13
 On October 29, 1982, the United States commenced a civil action to recover its cleanup costs.[1] It named P/B STCO 213, the barge's owner, Sabine Towing and Transportation Co., and the insurer, Water Quality Insurance Syndicate, as defendants. The United States sought reimbursement of its cleanup expenses on the ground that the United States performed the cleanup operation the defendants should have performed:
 
 
 14
 By reason of this failure of the defendants to properly remove the oil, the United States, pursuant to 33 U.S.C. Sec. 1321(c)(1), and in its sovereign capacity, caused the oil to be removed at an actual cost to the United States of $197,758.41.
 
 
 15
 By reason of the said discharge of oil, and the failure of defendants to properly remove the oil, defendants ... became and are liable to the United States, pursuant to 33 U.S.C. Sec. 1321(f), in the amount of $197,758.41 as reimbursement for the actual costs of removal.
 
 
 16
 The district court, 569 F.Supp. 743, ultimately granted summary judgment in favor of the defendants, holding that the government's action to recoup cleanup costs was barred by the three-year tort provision of 28 U.S.C. Sec. 2415(b). The district court reasoned that the United States' action essentially sought damages for the tortious act of discharging oil in violation of statute. The district court rejected the United States' contention that its action was for restitution and therefore founded upon an implied contract, reasoning that "the cleanup actions of the government are done for the benefit of the public, not the polluter."
 
 
 17
 The United States appeals from the summary judgment in favor of the defendants.
 
 
 18
 No. 83-4716--Almost Three Years, Eight Months After Cleanup
 
 
 19
 Tank barge 7026 sank at its mooring at a dock in Nederland, Texas on January 28, 1979. 8400 gallons of oil discharged from the barge into the Neches River.
 
 
 20
 Conoco, Inc. owned T/B 7026. At the time of the discharge, the barge was leased to Gulf Water Towing, Inc. At first, Gulf Water Towing attempted to clean up the spillage of oil. It soon aborted the cleanup effort, and the United States hired private contractors to conduct the cleanup operation. Cleanup was completed on February 3, 1979. The United States incurred a total expense of $20,207.99.
 
 
 21
 On February 3, 1979, the United States commenced a civil action to recover its cleanup costs. It named Gulf Water Towing and T/B 7026 as defendants. Though this original complaint was filed within three years of the completion of cleanup, the limitations controversy arose when the United States amended its complaint on September 27, 1982 to include Conoco as a defendant. In this action, too, the allegations of the United States focused on the defendants' failure to clean up the oil spill and were virtually identical to those set forth above.
 
 
 22
 The district court granted summary judgment in favor of Conoco, holding that the action of the United States to recover cleanup costs was barred by the three-year tort provision of 28 U.S.C. Sec. 2415(b). The district court was of the view that "[t]he single issue in this summary judgment is whether oil pollution is a tort." The district court concluded that oil pollution is a tort, that the United States sought damages for the commission of that tort, and, accordingly, that the action was founded upon a tort. It rejected the United States' implied contract theory on the ground that "[t]he tortfeasor has received no unjust enrichment at the hands of the victim."
 
 
 23
 The United States appeals from the summary judgment in favor of Conoco.[2]
 
 
 24
 No. 84-2087--Five Years, Eleven Months After Cleanup
 
 
 25
 Tank barge STCO 225, pushed by the motor vessel Achilles, collided with another tank barge on September 26, 1976. The collision occurred near Port Arthur, Texas. 1,000 barrels of light crude oil spilled into the Neches River from T/B STCO 225. The United States hired private contractors to clean up the spill and cleanup was completed on October 7, 1976. The total cost to the United States of cleanup was $84,374.56.
 
 
 26
 On September 14, 1982, the United States commenced a civil action to recover its cleanup expenses. It named T/B STCO 225, M/V Achilles, Sabine Towing and Transportation Co. (the owner of the barge and vessel), and Water Quality Insurance Syndicate (the insurer) as defendants. The allegations of the complaint also were virtually identical to those in No. 83-2644.
 
 
 27
 The defendants moved for summary judgment on the 28 U.S.C. Sec. 2415(b) tort theory accepted by the district courts in No. 83-2644 and No. 83-4716. The district court in this action, however, denied summary judgment, holding that the action was not barred by the three-year tort provision of 28 U.S.C. Sec. 2415(b). The district court held that, instead, the action was timely under the six-year implied contract provision of 28 U.S.C. Sec. 2415(a), reasoning that the claim was "rooted in quasi-contract" because the United States performed the polluter's duty to clean up, citing Restatement of Restitution Sec. 115 (1937).
 
 
 28
 After denial of summary judgment, the parties filed stipulations of fact. The district court thereafter entered final judgment in favor of the United States in the full amount of the United States' cleanup costs. The defendants appeal from that judgment.
 
 II.
 
 29
 The sovereignty of the United States exempts it from all periods of limitations except where, by legislation, it expressly has consented to a time bar. This is a rule designed to protect all citizens against the inattentiveness of their political and civil servants. Guaranty Trust Co. v. United States, 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938); United States v. Thompson, 98 U.S. (8 Otto) 486, 488-89, 25 L.Ed. 194, 195 (1879); United States v. City of Palm Beach Gardens, 635 F.2d 337, 340 (5th Cir.1981).
 
 
 30
 The FWPCA contains no limitations period applicable to a cleanup cost recovery action brought by the United States under 33 U.S.C. Sec. 1321(f)(1). Congress has enacted a general statute of limitations, however, and it is applicable across-the-board to all actions brought by the United States if they are "founded upon any contract express or implied in law or fact" (six years) or "founded upon a tort" (three years). 28 U.S.C. Sec. 2415(a) & (b).
 
 
 31
 The parties have identified no legislative history indicating if Congress intended the tort or contract limitations periods of 28 U.S.C. Sec. 2415 (or neither) to apply to actions brought by the United States under 33 U.S.C. Sec. 1321(f)(1) for the recovery of pollution cleanup costs. Neither the Supreme Court, this circuit, nor any other circuit has addressed this issue. The district courts have split on the issue.[3]
 
 III.
 
 32
 The evolution of federal water pollution legislation to its current form has been set forth in detail elsewhere, and we do not repeat that history here.[4] We do set forth, however, the key features of the FWPCA relevant to the issue before us.
 
 
 33
 The FWPCA imposes on polluters the duty to clean up the waters they have polluted. 33 U.S.C. Sec. 1321(c)(1) provides that the United States may conduct the cleanup if the polluter fails "properly" to do so: "Whenever any oil or a hazardous substance is discharged ... the President is authorized to act to remove or arrange for the removal of such oil or substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel, onshore facility, or offshore facility from which the discharge occurs." (Emphasis added). The Fourth Circuit has interpreted this language to place on the polluter "[t]he primary duty for cleaning the oil spill." United States v. Barge Shamrock, 635 F.2d 1108, 1110 (4th Cir.1980). So, too, have we.
 
 
 34
 In United States v. Dixie Carriers, Inc. (Dixie Carriers II), 736 F.2d 180, 185 (5th Cir.1984), the polluter-defendant asserted that it had no obligation to clean up the water; rather, according to the defendant, it could choose to permit the government to clean up and then to reimburse the government. We clearly rejected the contention that a polluter has such a choice and recognized instead that it has a primary duty to clean up:
 
 
 35
 [W]hile the Act provides for the government's recovery of at least part of the cleanup costs incurred by it, it nowhere relieves the owner of the discharging vessel of his responsibility to clean up the discharge from his vessel in violation of the Act.
 
 
 36
 The legislative reports contemplated that the government would step in to remove the discharge only if the owner failed or was unable to perform his own obligation to clean up the illegal discharge from his vessel. The statutory scheme contemplated thereby, thus, was that Sec. 1321(f) afforded the government a remedy to recover from the discharger at least part of the costs of the cleanup incurred by the government upon the owner's failure to do so himself, but neither by express provision of the Act nor by implication from the legislative history did this statutory scheme relieve the owner of his initial and primary responsibility, as contemplated by the Act, to clean up his own illegal discharge.
 
 
 37
 United States v. Dixie Carriers, Inc. (Dixie II), 736 F.2d 180, 185-86 (5th Cir.1984) (emphasis in original; citation deleted).[5]
 
 
 38
 The polluter's primary duty to clean up also is shown in two other provisions of the FWPCA. First, 33 U.S.C. Sec. 1321(g) requires the owner or operator of the discharging vessel, barge, or onshore facility "to pay to the United States Government the actual costs" of cleanup--even before an adjudication of liability--if its defense in a cleanup cost recovery action is that the sole cause of the discharge was the act or omission of a third party.[6] The owner or operator thereafter may sue the third party or assert subrogation rights in any action by the United States against the third party in the event it prevails on its sole cause defense. 33 U.S.C. Sec. 1321(g) & (h). Congress' indicated intent, thus, was to place the cost of cleanup on the polluter in the first instance regardless of his ultimate liability for cleanup costs.
 
 
 39
 Second, the FWPCA specifically gives an owner or operator who cleans up the right to sue the United States in the Court of Claims and to recover cleanup costs upon proof that the sole cause of the discharge was an act of God, an act of war, negligence on the part of the United States, or the act or omission of a third party. 33 U.S.C. Sec. 1321(i)(1). By this provision Congress clearly envisioned that a discharging owner or operator, without regard to ultimate liability, would clean up its discharge.
 
 
 40
 If the polluter defaults on his primary duty to clean up, the FWPCA limits in significant respects the legal liability of the polluter to pay cleanup costs. Though the United States clearly is authorized to clean up if the discharger does not, it is not required to clean up. 33 U.S.C. Sec. 1321(c) provides only that "the President is authorized to act to remove or arrange for the removal of such oil or substance."
 
 
 41
 The President may act or decline to act. Presumably, once a government cleanup is started it can be delayed at the direction of the President. He could direct a responsible party to become involved. Government action in appropriate circumstances might be terminated prior to completion.
 
 
 42
 United States v. Barge Shamrock, 635 F.2d 1108, 1110 (4th Cir.1980). In addition, the FWPCA makes the discharger liable to the United States only for reimbursement of "the actual costs incurred" by the United States in cleanup. 33 U.S.C. Sec. 1321(f)(1)-(2). Thus, if the United States does not clean up, the discharger has no liability to the United States for what the cost of cleanup would be. And, if the United States partially cleans up, the discharger's liability is no greater than the cost of cleanup actually performed.
 
 IV.
 
 43
 For the reasons set forth in Part V below, we find that the three-year tort provision of 28 U.S.C. Sec. 2415(b) does not apply, but that instead, for the reasons set forth in this Part, the present actions are founded upon a contract implied in law (quasi-contract) and therefore governed by the six-year limitation period of 28 U.S.C. Sec. 2415(a).
 
 
 44
 Congress imposed a six-year period of limitations on actions brought by the United States if they are "founded upon any contract express or implied in law or fact." 28 U.S.C. Sec. 2415(a). " 'Contract implied in law' is a synonym for 'quasi-contract.' " United States v. Neidorf, 522 F.2d 916, 919 (9th Cir.1975), cert. denied, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).[7] "The six-year limitation [applies] to all types of contracts, express or implied in law or in fact." United States v. Limbs, 524 F.2d 799, 802 (9th Cir.1975), quoting, Hearings on H.R. 13652 Before Subcomm. No. 2 of the House Comm. on the Judiciary, 89th Cong., 2d Sess. 7 (1966); see United States v. City of Palm Beach Gardens, 635 F.2d 337, 340-41 (5th Cir.1981) (implicitly recognizing applicability of Sec. 2415(a) to quasi-contracts--contracts implied in law).
 
 
 45
 The quasi-contract action (i.e., on a contract implied in law) is distinguished from actions on express and implied-in-fact contracts because the ultimate aim of the theory of quasi-contract is not the enforcement of express or implied promises. It is ultimately aimed at enforcing a judgment of the law that one party rather than another is entitled to a thing of value or obligated to bear the cost of the performance of a duty.[8]
 
 
 46
 A quasi-contract, thus, arises when there is a "duty ... imposed by law in the absence of a promise." 2 T.A. Street, The Foundation of Legal Liability, at 202 (1906). It enforces a "duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment." Bloomgarden v. Coyer, 479 F.2d 201, 208 (D.C.Cir.1973). See United States v. City of Palm Beach Gardens, 635 F.2d 337, 341 (5th Cir.1981). And unjust enrichment may consist either (a) of one's retention of something to which another has a superior entitlement or (b) of one's avoidance and consequent shifting to another of the cost of performing a duty that one is primarily obligated to perform.
 
 
 47
 The idea here is that if money be expended by one person on behalf of another the law will impose a duty to compensate on the person thereby benefited, if on general principles of equity the money should have been paid in the first instance, in whole or in part, by him rather than by the plaintiff.
 
 
 48
 * * *
 
 
 49
 The duty to compensate for money expended to the use of another is sometimes imposed under circumstances where to superficial observation there seems to have been no enrichment of the defendant.... But a little thought will show that a party is unjustly enriched as well where his estate is exonerated, or where a claim is settled which he ought to have paid, as where property or money directly accrues to him.
 
 
 50
 2 T.A. Street, Foundations of Legal Liability, at 233-34 (1906).[9]
 
 
 51
 Courts consistently have recognized these principles and have imposed on defendants a quasi-contractual obligation to reimburse a plaintiff, who has performed a duty, at his own expense, where the defendant was primarily obligated to discharge the duty. This is especially true where the performance of the duty was necessary to preserve the public's welfare and safety.
 
 
 52
 The Supreme Court has held that a defendant has a quasi-contractual obligation to reimburse the government when it incurs costs discharging a duty the defendant would not perform. Metropolitan Railroad Co. v. District of Columbia, 132 U.S. 1, 10 S.Ct. 19, 33 L.Ed. 231 (1889). The charter of the District of Columbia imposed on the defendant a duty to do certain paving work, and, upon the failure of the defendant to do the paving, the District of Columbia paid another to do the paving and thereafter sued the defendant for costs incurred "in consequence of the neglect of the defendant to do said work and furnish said materials in accordance with its duty as prescribed by [the charter]." Id. at 2, 10 S.Ct. at 20, 33 L.Ed. at 232. The Court held the action barred by a statute of limitations applicable to contract actions, notwithstanding the argument of the District of Columbia that the action was not founded upon a contract. Id. at 12-13, 10 S.Ct. 23, 33 L.Ed. at 236. In so holding, the Court made it plain that the District of Columbia's action was not simply one founded on statute--and therefore outside any statute of limitations--but was founded on a quasi-contract or contract implied in law:
 
 
 53
 We think ... that the [lower] court is in error in supposing that the present action is founded on the statute. It is an action on the case upon an implied assumpsit arising out of the defendant's breach of a duty imposed by statute, and the required performance of that duty by the plaintiff in consequence. This raised an implied obligation on the part of the defendant to reimburse and pay to the plaintiff the moneys expended in that behalf. The action is founded on this implied obligation, and not on the statute, and is really an action of assumpsit. The fact that the duty which the defendant failed to perform was a statutory one does not make the action one upon the statute.
 
 
 54
 Id., at 12-13, 10 S.Ct. at 23, 33 L.Ed. at 236. Cf. Presby v. Bethlehem Village District, 120 N.H. 493, 416 A.2d 1382, 1384 (1980) (contractor performing duty of governmental entity to provide sewer entitled, under quasi-contract theory, to recover cost of installation from governmental entity).
 
 
 55
 The quasi-contract principle stated in Metropolitan Railroad is embodied in the Restatement of Restitution. It provides:
 
 
 56
 A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent, is entitled to restitution from the other if
 
 
 57
 (a) he acted unofficiously and with intent to charge therefor, and
 
 
 58
 (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety.
 
 
 59
 Restatement of Restitution Sec. 115 (1937).[10]
 
 
 60
 The Second Circuit recently applied Restatement of Restitution Sec. 115. In United States v. Consolidated Edison Co., 580 F.2d 1122 (2d Cir.1978), the United States sued Consolidated Edison to recover the cost of electricity it diverted to Consolidated Edison when a power shortage caused threat of blackouts. Id. at 1123-26. The court held that Consolidated Edison had a quasi-contractual obligation, "embodied in Section 115 of the Restatement of Restitution," to reimburse the United States for the cost of the electricity. Id. at 1126-31.
 
 
 61
 The basis for recovery in this case is that the [United States] performed Con Edison's duty to acquire and maintain adequate supplies of electrical power under emergency conditions with the clear intent that it be reimbursed for its costs.
 
 
 62
 Id. at 1127. The court noted that "[d]uty is a flexible concept," and found Consolidated Edison's "general responsibility" to provide its customers with electricity sufficient to give rise to a quasi-contractual action in favor of the United States even though Consolidated Edison would only be liable to its customers in the event of intentionally wrongful or grossly negligent cutoffs. Id. at 1127-28.[11] See Ford v. United States, 88 F.Supp. 263, 264, 115 Ct.Cl. 793 (1950) (American soldier liable to United States under quasi-contract theory law where United States repaid foreign nation the money the soldier stole).
 
 
 63
 In an action similar to an FWPCA cleanup cost recovery action, the Supreme Court has used an essentially quasi-contract analysis to hold that the United States may recover under Section 15 of the Rivers and Harbors Act, 33 U.S.C. Sec. 409, for its cost of removing a negligently sunken vessel from navigable waters. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 197, 88 S.Ct. 379, 383, 19 L.Ed.2d 407 (1967).[12] The statute does not specifically authorize such cost recovery, but the Court found the right of the United States to recover derived from the clear statutory duty of the vessel owner to remove the vessel. Id. at 204-05, 88 S.Ct. at 387. Indeed, the Court specifically cited Restatement of Restitution Sec. 115:
 
 
 64
 Having properly chosen to remove such a vessel, the United States should not lose the right to place responsibility for removal upon those who negligently sank the vessel. See Restatement of Restitution Sec. 115; United States v. Moran Towing & Transportation Co., 374 F.2d 656, 667 (C.A. 4th Cir.1967). No issue regarding the propriety of the Government's removal of Wyandotte's barge is now raised. Indeed, the facts surrounding that sinking constitute a classic case in which rapid removal by someone was essential. Wyandotte was unwilling to effectuate removal itself. It would be surprising if Congress intended that, in such a situation, the Government's commendable performance of Wyandotte's duty must be at Government expense. Indeed, in any case in which the Act provides a right of removal in the United States, the exercise of that right should not relieve negligent parties of the responsibility for removal. Otherwise, the Government would be subject to a financial penalty for the correct performance of its duty to prevent impediments in inland waterways. See United States v. Perma Paving Co., supra, 332 F.2d at 758 [2 Cir.1964].
 
 
 65
 Id. (emphasis added).
 
 
 66
 Although in Wyandotte the Supreme Court did not refer expressly to quasi-contract, Wyandotte 's analysis mirrors the quasi-contract analysis specifically addressed in the previously-discussed decisions. Restatement of Restitution Sec. 115 is the embodiment of a quasi-contract analysis, and Wyandotte cites it as support for the proposition that the vessel owner ought to bear the ultimate cost of removal. A recent authoritative treatise states that Wyandotte is an application of the traditional quasi-contractual principles of Restatement of Restitution Sec. 115 to an action in which the plaintiff "performed the defendant's obligation to specifically rectify the consequence of his tort." 2 G.E. Palmer, The Law of Restitution Sec. 10.6, at 408 (1978).[13] The Sixth Circuit has also interpreted Wyandotte as providing the United States a "cause of action based in restitution" because of its performance of another's duty. United States v. Boyd, 520 F.2d 642, 644-45 (6th Cir.1975), cert. denied, 423 U.S. 1050, 96 S.Ct. 776, 46 L.Ed.2d 638 (1976).
 
 
 67
 The Restatement is clear that an action for restitution is in the nature of contract (or, in its older form, assumpsit):
 
 
 68
 The appropriate proceeding in an action at law for the payment of money by way of restitution is:
 
 
 69
 (a) in States retaining common law forms of action, an action of general assumpsit;
 
 
 70
 (b) in States distinguishing actions of contract from action of tort, an action of contract. ...
 
 
 71
 Restatement of Restitution Sec. 5 (1937) (emphasis added). See Restatement (Second) of Restitution, at 2 (Tent. Draft No. 1, 1983) ("Restitution at law is the progeny of the action of assumpsit ... which gave rise to the general theory of money recovery known as quasi-contract.").
 
 V.
 
 72
 An FWPCA cleanup cost recovery action under 33 U.S.C. Sec. 1321(f)(1)-(2) fits squarely within the classic quasi-contract framework of Restatement of Restitution Sec. 115 and the judicial decisions that recognize a government's quasi-contractual right to recover its costs incurred in discharging a defendant's duty where doing so is important for the protection of the public. In each case before us, the United States alleged: (1) the defendant had a cleanup duty that it failed to perform; (2) the United States performed that duty with the clear intent to charge; and (3) the United States acted to preserve the public health and welfare in fulfillment of its statutory mandate and therefore acted unofficously. Moreover, the right of the United States to recover cleanup costs is contingent upon, and limited to the extent of, cleanup; this is plainly a remedy limited to restitution and does not include compensatory damages. As we have seen, Restatement of Restitution Sec. 5 defines an action for restitution as one founded on contract.
 
 
 73
 In sum, then, the FWPCA is a clear expression of a quasi-contractual allocation of duty and the expense of bearing the duty. Cf. United States v. Boyd, 520 F.2d 642 (6th Cir.1975) (noting possible application of 28 U.S.C. Sec. 2415(a) implied-in-law contract provision to Wyandotte action for cost of missing sunken vessel), cert. denied, 423 U.S. 1050, 96 S.Ct. 776, 46 L.Ed.2d 638 (1976). The government's actions in the present case, admittedly filed within six years after the rights of action accrued, were timely as filed within the six-year limitations period provided by 28 U.S.C. Sec. 2415(a) for an action "founded upon any contract express or implied in law."
 
 
 74
 The defendants' contentions that the three-year tort limitations applies
 
 
 75
 The defendants urge that they did not consent to the government cleanup and that it is therefore unfair to imply a contract to reimburse the government.
 
 
 76
 Although the defendants' consent may be inferrable from their knowing acquiescence in the government cleanup, we do not rest our holding upon such an inference. A contract implied in law, i.e., a quasi-contract, exists in the absence of consent, for the reasons stated in Part IV above. The absence of consent, indeed, is the basis for the law to imply a contract, in order to assure that the proper parties bear the cleanup costs. Indeed, Restatement of Restitution Sec. 115 explicitly is premised on a plaintiff "acting without the [defendant's] knowledge or consent."
 
 
 77
 The defendants also urge that they have not been enriched and that, thus, the United States' right to recover cleanup costs cannot be based on a quasi-contract. The district courts so concluded in No. 83-2644 and No. 83-4716. However, by failing to perform their statutory duty to clean up the water they polluted, thereby causing the government to fulfill their duty, the defendants avoided the cost of doing what they were primarily obligated to do. In effect, they caused another, the United States, to pay their debt. As demonstrated in Part III above, one is enriched when another discharges his obligation or pays his debt, just as he is enriched when funds are transferred directly to him.
 
 
 78
 The defendants emphasize, as did the district court in No. 83-4716, that pollution is a tort. Pollution may be a tort, but the act of polluting does not form the basis of the FWPCA cleanup cost recovery action. The action is based on the fact of cleanup by the United States after a defendant's default on its own, primary cleanup obligation.
 
 
 79
 There is no particular difficulty in viewing, for limitations purposes, an action as founded upon contract merely because proof of the alleged quasi-contract requires proof of a tort. Quasi-contract, after all, typically requires unjust enrichment, and the unjustness often has depended upon proof of what might be a tort. Restatement of Restitution, supra, Ch. 7 (Benefits Tortiously Acquired), Secs. 128-138 (tort may give rise to quasi-contract action, where recovery focuses on benefit to defendant and not damage to plaintiff); Restatement (Second) of Restitution, Ch. 4, Sec. 45-48 (Tent. Draft No. 2, 1984) (Restitution for Wrongful Conduct); W.A. Keener, The Law of Quasi-Contracts, Ch. 3, at 159-213 (1893); Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533, 538 (1912).[14] Indeed, it has been expressly recognized that a plaintiff may elect to found his action upon quasi-contract rather than tort because of tactical or procedural considerations, including a possibly longer limitations period applicable to the contract rather than the tort action.[15]
 
 
 80
 Here, however, the government's cause of action is not founded upon a tort. The government's quasi-contractual right to restitution required proof, it is true, of the defendants' tortious pollution of the waters; but the government seeks recovery not for compensatory damage caused by tort, but instead for the government's costs of cleanup based upon a contract implied in law arising out of the defendants' failure to perform their own primary duty to clean up the pollution for which they were responsible.
 
 
 81
 Finally, the defendants urge that the reasoning of United States v. Central Soya, Inc., 697 F.2d 165 (7th Cir.1982), requires us to conclude that the FWPCA cleanup cost recovery action is founded upon a tort. In Central Soya, the Seventh Circuit held that an action by the United States under the Rivers and Harbors Act, 33 U.S.C. Secs. 408 & 412, to recover for damages to a bridge caused by a runaway barge was founded upon a tort for the purpose of the statute of limitations. In Central Soya, however, the defendant did not have a duty to repair the damage it caused. Specifically, the defendant had no duty to repair the bridge. The statutory obligation to respond in damages by satisfying a judgment is distinct and critically different from the duty to repair or remedy harm. See United States v. Consolidated Edison Co., 580 F.2d 1122, 1128 (2d Cir.1978). Thus, in Central Soya, the United States did not, in repairing its bridge, perform a duty the defendant failed to perform, and Central Soya is not inconsistent with our holding here.
 
 
 82
 The government's alternative contention: No time-bar at all
 
 
 83
 The United States asks us to find that the FWPCA cleanup cost recovery action is a unique statutory action founded upon neither a tort nor a contract. It contends, therefore, that neither the tort nor contract time-bar of 28 U.S.C. Sec. 2415 bars its actions, concededly the only time-bars potentially applicable, see Part II above. The government reasons essentially that the FWPCA was intended to create a new and unique system of liability. This premise does not diminish the contract-implied-in-law nature of the cleanup cost recovery action. The FWPCA imposes, to be sure, a new duty upon the polluter--the duty to clean up. That duty is precisely what gives rise to the right of the United States to recover in quasi-contract. As Wyandotte, supra, makes clear, the United States would have been entitled to restitution for its cleanup costs even in the absence of an express statutory provision to that effect. It suffices that the statute places the duty to clean up on the polluter and authorizes the United States, in the event of a default by the polluter, to clean up. In short, while the statute imposed new duties, the very imposition of those duties and the announcement of relative cleanup obligations is what gives rise to the United States' right to recover (receive restitution) in quasi-contract for its cleanup costs.
 
 
 84
 The government's reliance upon United States v. City of Palm Beach Gardens, 635 F.2d 337 (5th Cir.1981), is not persuasive. There, the United States sued to recover federal funds used in the construction of a non-profit hospital that, subsequently, had been sold to a profit-making organization. A statute expressly gave the United States a right to sue to recover the federal funds in that circumstance. 635 F.2d at 338 & n. 1. Because the United States sued to recover the funds approximately eight years after the sale of the hospital, the defendants argued that the action was barred by the six-year contract provision of 28 U.S.C. Sec. 2415(a). We held, however, that the action was subject to no period of limitations because it was not based on a quasi-contract. 635 F.2d at 340-41. We reasoned that there was no unjust enrichment because the defendant "was under no obligation to maintain its hospital as a non-profit facility" and "was under no obligation to turn over money to the federal government upon the sale of its hospital to a profit-making organization." Id. We expressly distinguished a decision where a quasi-contract was found because the defendant did have an obligation to turn funds over to the United States. Id.; see United States v. Limbs, 524 F.2d 799 (9th Cir.1975).
 
 
 85
 City of Palm Beach, therefore, holds only that an action by the United States pursuant to a statute authorizing it to sue for the return of funds is not founded on contract where the defendant did not wrongfully obtain the funds and is not obligated to return the funds in the absence of a timely-sought judgment. As in Central Soya, supra, the non-governmental defendant was sued under a statute authorizing a money judgment for non-performance of an obligation, but requiring no act by the defendant in the absence of such a timely-sought judgment; hence, the action against it to reimburse the government was not founded upon a contract implied in law (i.e., not upon quasi-contract). In the cases before us, however, as we have explained, the defendants failed to perform a clear duty that, instead, was performed by the government; hence, the restitution actions are based upon the government's cleanup costs incurred by it because of the defendants' non-performance of that duty--that is, on the basis of a contract implied in law (quasi-contract). Accordingly, City of Palm Beach, like Central Soya, is distinguishable from the cases before us.[16]
 
 Conclusion
 
 86
 Therefore, No. 83-2644 and No. 83-4716 are REVERSED and REMANDED to the district court for further proceedings consistent with this opinion, and No. 84-2087 is AFFIRMED.
 
 
 87
 No. 83-2644 REVERSED and REMANDED.
 
 
 88
 No. 83-4716 REVERSED and REMANDED.
 
 
 89
 No. 84-2087 AFFIRMED.
 
 
 
 [1]
 In this action, as in No. 83-4716 of these consolidated appeals, the United States also sought enforcement of a civil penalty assessed by the Coast Guard against certain of the defendants. The defendants do not contend that the limitations question, the only one presented in these appeals, involves or affects the civil penalty claim of the United States
 
 
 [2]
 The only appeal taken in No. 83-4716 is that taken by the United States from the summary judgment in favor of Conoco. The only issue the United States presents is the limitations issue; it raises no issue concerning a possible "relation back" of its amended complaint that would avoid its limitations difficulty. We note also that the district court conducted a trial on the merits as to the other defendants and rendered judgment in favor of the United States. No appeal has been taken from that judgment
 
 
 [3]
 Some have viewed the action to be founded upon a tort, as did the district courts in No. 83-2644 and No. 83-4716. E.g., United States v. Dae Rim Fishery Co., No. A84-108 Civil (D.Alaska Nov. 8, 1984) (unpublished). Others have viewed the action to be founded upon a contract implied in law, as did the district court in No. 84-2087. E.g., United States v. C & R Trucking Co., 537 F.Supp. 1080 (N.D.W.Va.1982); United States v. Healy Tibbitts Construction Co., No. C-83-3072 JPV (N.D.Cal. May 1, 1984) (unpublished). No court has viewed the action as founded upon neither contract nor tort and therefore outside 28 U.S.C. Sec. 2415
 
 
 [4]
 See generally United States v. Dixie Carriers, Inc. (Dixie Carriers I), 627 F.2d 736, 738 (5th Cir.1980); United States v. M/V Big Sam, 681 F.2d 432, 435 (5th Cir.1982); G. Gilmore & C. Black, The Law of Admiralty Sec. 10-4(b), at 824-29 (1975); Note, Oil Spills and Cleanup Bills: Federal Recovery of Oil Spills Cleanup Costs, 93 Harv.L.Rev. 1761 (1980); Higgins, Pollution: International Conventions, Federal and State Legislation, 53 Tul.L.Rev. 1328 (1979); N. Healy & D. Sharpe, Cases and Materials on Admiralty, at 732-33 (1974)
 
 
 [5]
 This holding is consistent with Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). There the Supreme Court held that the Rivers and Harbors Act, 33 U.S.C. Sec. 409, imposes a duty on the owner of a negligently sunk vessel to remove it from navigable waters. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 206-07, 88 S.Ct. 379, 388, 19 L.Ed.2d 407 (1967). The statute specifically referred to that duty. Id. The negligent owners contended that they had a choice to remove or abandon a sunken vessel, based on the statute's provision that the failure to remove constituted an abandonment entitling the United States to raise the vessel and to proceed against it in rem for its costs. Id. The Court flatly rejected this contention, holding that the statutory rights and remedies of the United States did not release a vessel owner from his primary duty to raise the sunken vessel. Id
 
 
 [6]
 An owner or operator may avoid ultimate responsibility for the cost of cleanup if it proves "that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent." 33 U.S.C. Sec. 1321(f)(1)-(2). The defenses are narrow, and the FWPCA cleanup cost recovery provision has been reviewed as essentially imposing strict liability. See United States v. M/V Big Sam, 681 F.2d 432, 437 (5th Cir.1982)
 
 
 [7]
 We use the term "quasi-contract" rather than "contract implied in law" because the clear weight of scholarship suggests the former is more precise, reflecting the absence of promise that distinguishes so-called contracts implied in law from true contracts in which the parties' mutual promise is express or implied in fact. See 1 G.E. Palmer, The Law of Restitution Sec. 1.2, at 8 (1978); W.A. Keener, The Law of Quasi-Contracts, at 3-25 (1893); Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533, 544-45 (1912)
 
 
 [8]
 Professors Keener, Corbin, and Williston succinctly stated the non-consensual, policy-grounded basis of quasi-contract. Quasi-contract "is a term used to cover a class of obligations where the law, though the defendant did not intend to assume an obligation, imposes an obligation upon him, notwithstanding the absence of intention on his part, and in many cases in spite of his actual dissent." W.A. Keener, The Law of Quasi-Contracts, at 5 (1893). "Quasi contractual obligations are imposed by the law for the purpose of bringing about justice without reference to the intention of the parties." 1 Williston on Contracts Sec. 3A, at 14 (3d ed., 1957). "A quasi contractual obligation is one that is created by the law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent." 1 Corbin on Contracts Sec. 19, at 46 (1963). Professor Corbin tartly noted that "[t]he term quasi is introduced as a weasel word, that sucks all the meaning of the word that follows it," id. at 45-46; nevertheless, the phrase quasi-contract endures as a label for actions in which recovery is based on the theory of a non-consensual promise imposed for policy reasons of equity and justice. See Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533, 544 & 545 n. 63 (1912)
 
 
 [9]
 This principle has been expressed frequently. See Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830, 835 n. 4 (2d Cir.) (permitting avoidance of cost is conferral of a "tangible pecuniary benefit;" moreover, "[t]he value rendered in performing another's duty is sufficient to permit [quasi-contract] recovery"), cert. denied, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977); Restatement of Restitution Sec. 1, comment b (1937) ("He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss."); Restatement (Second) of Restitution, at 15 (Tent. Draft No. 1, 1983) ("[T]he measure of restitution owed sometimes depends on gain or loss that would have ensued, as fairly estimated, if the occasion for restitution had not occurred."); Wade, Restitution for Benefits Conferred Without Request, 19 Vand.L.Rev. 1183, 1186 (1965) ("One is enriched not only when he receives an asset but also when someone else performs for him a duty which would be a burden to him.")
 
 
 [10]
 Professor Keener, in an early comprehensive work, stated:
 Where an obligation is imposed by law upon a person to do an act, because of the interest which the public has in its performance, it would seem that on the defendant's failure to perform, a person performing the same with the expectation of receiving compensation should be allowed to recover against the defendant.
 W.A. Keener, The Law of Quasi-Contracts, at 341 (1983). See Grossbier v. Chicago, St. Paul, Minneapolis & Omaha Railway Co., 181 N.W. 746, 748 (1921); Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533, 537 (1912); 66 Am.Jur.2d, "Restitution and Implied Contracts," Sec. 23 at 967 (1973) ("Where it is imperatively necessary for the protection of the interests of third persons or of the public that a duty owed by another should be performed, a stranger who performs it may be entitled to restitution from the other, even though his performance was without the other's knowledge or against his will.").
 
 
 [11]
 In an earlier decision, the Second Circuit had applied Restatement of Restitution Sec. 114 (1937), the private actor analogue to Sec. 115, in holding a defendant liable in quasi-contract to reimburse a plaintiff who had discharged the defendant's "manifest," if not unqualified, duty to obtain medical assistance for a sailor falling sick at sea. Peninsular & Oriental Steam Navigation Co. v. Overseas Oil Carriers, Inc., 553 F.2d 830 (2d Cir.), cert. denied, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977). In the earlier decision, the court expansively described the quasi-contract theory of recovery:
 Although the law ordinarily frowns on the claims of a "mere volunteer", there is a class of cases where it is imperative that a duty be performed swiftly and efficiently for the protection of the public or an innocent third party, in which a "good Samaritan" who voluntarily intervenes to perform the duty may receive restitution for his services. This rule has become crystallized in the doctrine that performance of another's duty to a third person, if rendered by one qualified to provide such services with intent to charge for them, is a ground for recovery in quasi-contract.
 Id. at 834.
 
 
 [12]
 The vessel removal in Wyandotte was critical to prevent the escape into the water of a large amount of deadly liquid chlorine. Wyandotte Transportation Co. v. United States, 389 U.S. 191, 194-95, 88 S.Ct. 379, 382, 19 L.Ed.2d 407 (1967). The underlying duty, therefore, concerned protection of the entire public. There is also a well-developed parallel to this type of case involving private parties seeking restitution for fulfilling a defendant's duty or moral obligation to a particular person. These private parties have succeeded in quasi-contract actions where the public has an important interest in the performance of the duty or moral obligation. Wade, Restitution for Benefits Conferred Without Request, 19 Vand.L.Rev. 1183, 1185, 1195-98 & nn. 58-80; Restatement of Restitution Secs. 112-14 (1937); G.E. Palmer, II The Law of Restitution Sec. 10.4(a), at 377-83 (1978)
 
 
 [13]
 Professor Palmer also observes that in Wyandotte the Court of Appeals had "viewed the claim of the United States as resting on the recovery of damages flowing from the defendant's negligence, with the cost of removal 'to be given consideration in the fixing of damages.' " G.E. Palmer, II The Law of Restitution Sec. 10.6, at 409 n. 31 (1978), quoting United States v. Cargill, 367 F.2d 971, 979 (5th Cir.1966). By contrast, as Professor Palmer notes, the Supreme Court viewed the cost of removal as the measure of recovery, thereby applying an exclusively restitutionary remedy
 
 
 [14]
 A tort will, of course, give rise to an action upon a quasi-contract only where there has been enrichment of a defendant; otherwise, the action is one for compensatory damages (tort) and not for restitution (quasi-contract). See W.A. Keener, The Law of Quasi-Contracts, at 160-62 (1893); Corbin, Quasi-Contractual Obligations, 21 Yale L.J. 533, 550-51 (1912)
 
 
 [15]
 "Quasi-contracts have been found to have [advantages] over tort claims based on identical facts.... In applying [statutes of limitations], court sometimes group together claims, based on breach of contract and restitutionary claims, to the advantage of the latter." Restatement (Second) of Restitution, at 137-38 (Tent. Draft No. 2, 1984). See Restatement of Restitution Sec. 5, comment b; Restatement of Restitution, at 524 (1937)
 
 
 [16]
 In United States v. Arrow Transportation Co., 658 F.2d 392 (5th Cir.1981), cert. denied, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982), we applied the traditional principle that laches cannot bar a suit by the United States and reversed an order dismissing a Wyandotte action for the recovery of the cost of raising a sunken vessel even though the action was filed twenty-eight years after the raising of the vessel. Our decision addressed only the laches issue, however, the only issue on appeal from the district court. We did not even mention the applicability of 28 U.S.C. Sec. 2415, and our decision in Arrow Transportation does not control resolution of the first-impression issue before us in these appeals